You may proceed. Thank you, Your Honors. Good morning. Andrea Marcus for Plaintiff C. L. May it please the Court. There is no dispute that the defendant's behavior intervention plan was legally appropriate at the time at issue. However, materially to this case, the defendants failed to follow the behavior intervention plan. You know, the facts are really complex, and I'm not at all confident that I have them right. So educate me. It looked to me like basically the boy, I think it was a boy, wouldn't do a lot of the stuff that was in the plan, and he did not attend the institution, the school, for part of the time, and that the nonconformity with the plan was essentially because he wasn't there. What am I missing there? I apologize for how complex the facts are here. There's actually two periods of time at issue when the plan was not complied with, and we're referring to the behavior intervention plan, which was scientifically created according to identifying the functions of the child's behavior. He has autism, so behavioral difficulties are actually what makes him eligible for the services to begin with. The two periods of time at issue are the periods of time when he was actually attending school, which was actually quite a brief period. It was about four or five weeks at issue here. And plaintiff argues that during that time, although the defendant had an appropriate behavior intervention plan in place, it did not follow the letter of the plan. And the second period of time is when the IEP placed the IEP amendment of the January 2011 IEP placed CL in the home as his instructional and educational setting. Are we still talking about the January 2011 IEP? Yes, Your Honor. Because the district is arguing that it was location-specific, and that location was the school, not the home, other than, I guess, the week when they were observing the special day class. Right. And, yes, I realize that, but that argument fails because under the code, there is an annual IEP, and the IEP can be amended. But as long as there is still consent to implement the rest of the IEP, the defendant is beholden to implement the rest of the IEP. Could you just say that in plain English? Yes. So in this case, we have the 2011 plan. Yes. You're saying that there's an amendment, an annual amendment to that plan that put the IEP execution for his home schooling? Yes. Let me just restate it to be sure, if Your Honor will allow it. Okay. Sure. So each year under the IDEA, there's an annual IEP. And that IEP under California Education Code 56-346, subsection E, has to implement all of the portions of that IEP that are consented to. Now, during the year and until the next IEP, that IEP can be amended, but the amendment only changes those things specifically set forth in the amendment. So where's the amendment? Yes. Was there an amendment that it would be the new location would be the home? Where is the amendment? There were multiple amendments changing the location. The final one that changed the location to the home was in September of 2011, and then again November 2nd of 2011. And there's a document in the record that amends the IEP? Yes, there is. And so where more specifically then to that amendment and your initial part about some of the events that took place while he was attending school, where in the administrative proceedings or the district court do you think they went wrong? What pages, where are we specifically looking at? Because it's quite an extensive decisions on both parts. Where are we specifically looking to find what really is at issue and the challenge? Well, I would argue that what's really at issue is quite simple. There was an agreed upon and consented to IEP, and the only thing that changed was the amendment that the educational setting be home. And instead, without legal authority, the OAH and then the central district adopted a new standard, which was once the child is placed at home, there's no reasonable expectation that the IEP will be implemented. Can you, so I guess I missed this because when I read the opinions, I didn't see discussion about an amendment to the January 2011 IEP that would be in the home other than for that one week. So where in the, let's start with the ALJ opinion. Where was that discussed in the ALJ opinion? I don't have the actual page here. I can get it for you and reserve two minutes for rebuttal. But what the ALJ did determine was that because the mother had signed an agreement with the change of location, that that by default had released the district of its obligation to provide the services. I'm looking at this paragraph 77. I just happened to open it to it, and it says, this is in the ALJ's opinion, and his next argument to support his theory that the district failed to implement the IEP, student appears to argue that the district should have been implementing the BIP, I guess that's the behavioral plan, even when student was not attending school and was receiving home hospital services. It is unclear what legal grounds exist to support this theory, since the BIP was related to students' in-school behavior and specifically geared to address that. So was it raised? Had you raised this argument to the ALJ that there was an actual amendment that would redirect it to the home? Yes, I did. Because the ALJ is saying no legal grounds exist to support this theory. There's no reference to an amendment at all. Well, I think part of it... Where's the amendment in the record? It is at... It is cited, actually, in the district's supplemental excerpts of record. I don't have the page number here. I mean, is this the key to your argument? I want to know what it says, because I feel like we're talking... The amendment says that, and right now I'm talking about the first amendment in September of 2011. The amendment says that although the district IEP team members believe that he should be placed in a special day class, the mother will not agree to that. So they are going to place him on home instruction or home hospital temporarily while she can review a class placement. Then the subsequent IEPs... And she agrees only to that portion. The subsequent IEP in November states that the district is again making the special day class available. And again, the mother is saying no, she will not agree to place him. And so he was going to be placed in home instruction, quote-unquote, for a period of time. It's a red herring that this is somehow a change of the initial offer in the annual IEP. It's very clear that it was never rescinded, the services that were offered in the annual IEP, January 18, 2011. That IEP provided for multiple services to support behaviors. Behaviors in an autistic child are equally as important to develop and teach as they are to eliminate. What does it mean in paragraph 77? After the portion read by Judge Okuda, then the administrative law judge goes on to say, or the hearing officer goes on to say, there's no evidence whatsoever that student had behavioral issues when receiving his home hospital schooling. And mother did not testify that he currently or earlier in 2011 or 12 experienced problems in the home. What is the impact or effect of that? Well, first of all, I would argue that it's completely irrelevant. The IDEA covers the responsibility of the school district to the child. And this court has determined in Anchorage that the child should not be penalized for parents' actions. But regardless of that, it doesn't excuse the district's responsibility to still implement the services in the IEP. That said- What services were required and not implemented while the child was at home? Thank you, Your Honor. The services are behavior instruction. Again, the IEP had goals that had to do with behavior other than just remediating negative behaviors that impacted his presence in the classroom. He was also being taught social behaviors, such as ending a conversation appropriately. In fact, the district itself offered that he should have some of his behavior services outside of the classroom anyway, so that he could have discreet behavior. Now, let me make sure I understand this. Thank you. The plan said behavior instruction is appropriate. Yes. The school offered behavior instruction in the school in a special class. Is that right? Yes. The mother did not agree with the amendment. She thought it was insufficient, so she kept the child at home. The behavior instruction was offered in the school but not at the home. But no plan said he should get the behavior instruction at home, and she did not present expert testimony that he should get the behavior instruction at home rather than at school. Is that correct? Do I have this right? No. Okay, help me. Actually, Your Honor, yes. Thank you for that. The January IEP is the base document, the core document for any amendment. The January IEP was never rescinded. The January IEP provides for what behavior services would be provided. The amendment IEPs only discuss where. Also, the amendment that offered the special day class that my client's mother did not consent to is actually irrelevant to the district's failure to offer supports and implement the January IEP while he was at home because she never consented to it, and the district did not follow through with the legal requirements to enforce that consent. I guess that's where my understanding is breaking down. As I recall, the way these cases work is the parent must be consulted, but it is not the law that what must be done has to be what the parent consents to or wants. There has to be a determination by the ALJ about what's appropriate. Your Honor, yes, and I would argue that actually we go back to the IEP team. It has to be determined by the IEP team what's appropriate, and at the end of the IEP team, the district determined it was appropriate and offered to place my client at home. What they did at that point was fail to implement or offer to implement all the services that were incorporated and encompassed in that IEP. I guess I'm still having trouble understanding. I would like to save a minute for rebuttal. I have some more questions, so we'll extend the time. A case we typically get is where the school offers something. The parent determines it's ineffectual. The parent advances money to get, oh, I guess the cases I've seen the most of, that LOVAS treatment at home. The school refuses to pay for it, and we wind up litigating about whether the district has to reimburse the parent for the cost of the LOVAS treatment. That's the typical IDEA case that I've had anyway. We call that the rich person's option. My client didn't have that option here. Since your client was not rich enough to get the LOVAS treatment, which is pretty expensive, what is it that we're supposed to do about it? I mean, 2011, 2012 are history now. I think it's very, very important that this court not endorse the loophole that . . . Is there anything at stake right now other than attorney's fees? Absolutely. The mother was able to find a Catholic school . . . We sent the kid to Catholic school, and that might have been better. Because they provided her a lot of financial aid, but she still had to pay $300 a month for his time there. And she had to quit her educational program so she could utilize the behavior training she received from Tri-Communities Regional Center. Let me get the chronology straight, though. In September, the amendment changes the location to home hospital on an interim basis so the mother can go to school and see if things are working out. Correct. And then the next amendment is like a month later in October, and it says it changed the placement from the Dorothea Lange School, et cetera. And that was the next amendment? That's correct, Your Honor. And so what we're talking about is September to October? No, Your Honor. From September to October, I would agree, was a temporary placement at home. He went back to school for two and a half days, at which point the horrific event happened where he was handcuffed and restrained and secluded over a period of multiple hours, ending up in handcuffs on the floor. After that, his mother took him back home and attended an IEP after that where they offered to introduce additional reactionary and putative measures. It was after that period that we're arguing that it was a permanent placement. The district did nothing to determine how it could serve him at home, but the IEP offered him his January IEP as well as the change in placement to home. So when does the change in placement to home after the interim period in September, does that occur in November? So between October and November, he's in the school, or he's just not going to school? He only went to school for two and a half days, and it took a while to get to the IEP. So then November, so is it really the November amendment that you're saying following that they didn't provide the services required by the 2011 January plan? Yes. Okay, so it's post-November that you're asking about. So it would be November through the time he was placed in the Catholic school, which was March. Right. So I have another question, and that has to do with the filing of the notice of appeal. I know that's a question here as to the timeliness of that motion. What's your best support for the notion that a scrivener's error or just a correction, for example, of the caption extends the notice of appeal time? It was an amended notice. It was an amended decision, and at the end of it, it said you have 90 days from this date to file your appeal, and there is no exception for a scrivener's note or an administrative note. The 90 days is really a federal law, correct? So we look to the federal statute, and wouldn't you then look to Rule 60B to see how this is handled as to, you know, or Rule 60 as to whether this actually extends the hearing period, I mean, the appeal period? I'm just having some trouble placing this procedurally where you say, because we have cases that say, you know, even if the court tells you, oh, you don't have to appeal until tomorrow, and then actually it's due today, they say, well, sorry, the court is in error, but it didn't matter, and we have cases like that. So are you relying primarily on the notice of appeal rights that is at the end of the decision? No, Your Honor. Your Honor, it was also, from my memory, it's my understanding that the Rule 60B did not specify the, did not apply because it was an administrative decision and because, I'd have to relook at it, but I don't think that it applied for the reasons that I put in my brief. Was it a material change? No, it was not a material change. Thank you. We're going to give you a little bit of rebuttal time. Thank you. But we have extended and asked you a lot of questions. Good morning, Your Honors. Peter Sansom on behalf of the Lucia Mar Unified School District. There are three grounds upon which this court should adjudicate this case in the district's favor. First, CL did not timely lodge his appeal with the district court. Second, even if this court were to determine that the appeal was timely lodged, this court should dismiss the second issue in CL's appeal because it is moot. That issue pertains to whether a February 3, 2012, individualized education program made a free, appropriate public education available to CL. That issue is moot because the parents subsequently consented to that IEP, and a new IEP was developed a few months later in October of 2015, which supersedes that February 3, 2012, IEP. Third, regardless of whether this court dismisses the second issue as moot, this court should affirm the district court's decision in its entirety because CL has failed to meet his burden of proof before this court to demonstrate that the district court committed a clear factual error or incorrectly applied the law. In regards to Your Honors' clarifying questions concerning the sequence of the individualized education programs, the annual IEP was dated January 18, 2011. The placement offer within that IEP can be found in CL's Excerpts of Record, Volume 3, pages 1072-1084. That IEP clearly made a placement available at a school site. The Behavior Intervention Plan, or the BIP as we sometimes say, was created Not us, just people with specializing skills. You say that. That behavior plan was created exclusively to address behaviors in school. At the time that Dr. Randall Ball conducted the assessment that led to that Behavior Intervention Plan, he interviewed CL's mother, V.L., and she told him very bluntly, I don't have problems with his behaviors at home. So there was nothing in that guiding annual IEP that provided a placement in the home or contained any sort of behavioral support or plan that had any connection with CL in his home. Now we fast forward to September 23, 2011. That IEP can be found in CL's Excerpts of Record, Volume 3, page 118. The IEP team met because CL had returned from summer break without accessing any special education programming during the summer, and it had been recommended because he would not be able to maintain skills with that type of break in his educational program. So he returns from the summer break having not received recommended services. When you say having not received, the passive voice makes it hard for me to understand. Were services offered and not accepted? Are you saying the mother did not accept the services? Correct, Your Honor. Thank you for the clarification. The district did make services available during the summer to CL. We refer to those as extended school year or ESY services. Could you please avoid the acronyms? All they do is make me drift off. V.L. did not access those services for CL. What services were offered where, and what do you mean by did not access? Are you saying some counselor was available at school and a kid didn't show up? What are you saying? There is a special education classroom that is available for him to receive instruction in for 20 school days, a credentialed special education teacher. Well, how about this? Were they services in the school or outside the school? In the school. Okay. They're also supportive services that were available. In any event, the services were not accessed. When you say services were not accessed, you mean mom didn't bring the kid to school to go to this class? Yes, Your Honor. Okay. CL returns in the fall, and his behaviors have essentially deteriorated as compared to the end of the preceding regular school year. And so the IEP team meets. This is a concern to the team. And their recommendation made in the September 23, 2011 IEP is CL should attend a special day class. That was the offer. And if you look specifically at the September 23, 2011 IEP, you can see that VL did not consent to that offer. There's actually a page within the IEP. You know, it just might be easier if we called her the mother and him the child. The mother. The mom or the mother. The September 23, 2011 document you're talking about, does that constitute a new IEP or an amendment to the 2011, to the January IEP? The IEP was an offer of an amendment to move the child into a special day class, but the mother did not consent. And that wasn't consented to. Not consented to. Okay. So then what happened after that? The October and November changes that opposing counsels. At the October 18, 2011 IEP, which can be found at District Supplemental Excerpt of Record Volume 2, page 178, the mother then agreed to consent to the special day class, a classroom on a school placement. And that was implemented. And then we have the behavioral incident on October 21. And after that incident, the mother did not return the child to school. What he continued to receive was a stand-alone temporary service of home instruction comprised exclusively of instruction from a teacher. There is no IEP document in the record legally obligating the school district to provide anything other than instruction from that teacher to CL in his home. Let me translate this, make sure I understand it. After the handcuff incident, the mother kept the boy at home, and the school sent a teacher to the home? Correct. And the teacher went to the home, and that was the extent of the services provided, and you're saying there was no IEP that required any additional services to be provided? In the home. In the home. Correct, Your Honor. And at this point, is there an amendment to the IEP in place or no? Other than the special daycare class, which was the last thing that he did. It was not until the IEP team reconvened on February 3, 2012, to develop a new IEP for CL, a meeting that his mother did not attend. Okay, so before you get to that, she says that really at issue here is post-November 2011 and that there was an amendment to the plan in 2011. So can you start there? I have in my notes November 2, 2011 changed placement to the home. It did not. The November 12, 2011 IEP, which is at CL's supplemental excerpts of record, volume 3, pages 1133 to 1147, that IEP continued to offer to the child the opportunity to return to a school-based placement. The parent chose not to access that, and instead CL continued to receive this standalone temporary service of in-home instruction. Can I just ask about this in-home instruction? Is that equivalent to like if a child was in a long-term physical situation and couldn't go to school, that the school would send you someone, but it's not necessarily part of an IEP? It's not even that substantial. The sequence of events was essentially a mother refusing to access an offered program at school. The mother said, I'm not bringing my child to school. The district did not want the child to go without any services, and so it was explained to the mother at the September 2011 IEP team meeting, we want you to look at our proposed special education classroom. While you do that... I think the question is pretty simple. How is it you get someone to come to your house and be your teacher? Is it because the school has an obligation in general under state law to educate children, and if they can't come for whatever reason for a longer term, you send them someone? Or is this somehow an adjunct to the IEP? It was through the IEP that the district offered and the mother accepted the standalone service. Is there a piece of paper that says that? There is. Okay. And what's that called? Well, there's an IEP. There's a September 23, 2011 IEP. That's the special day class. Correct. But I'm talking about the one where the teacher comes to your house. Yes, it's in that IEP as well. Because what happened was the district proposed the special day class. The mother said, I'm not sending my child there. And the district said, okay, well, that's still our offer. But in the interim, while you look at the program, we can send a teacher to the house. And if you look at the document in the record, you will see the mother's signature adjacent. So on an interim basis, the teacher comes to the house. Correct. Then there is an amendment in November 2011. There's an amendment on October 18, 2011, where the mother agrees to the special education classroom at the school. The child attends the special education classroom. Then we have the behavioral incident, October 21, 2011. The district reconvenes the IEP team meeting on November 2, 2011, explains to the mother, we want to educate him in the special education classroom. Please return him. The mother refuses to do that. The mother refuses to participate in an IEP team meeting. The district satisfies its legal obligation to develop a new IEP on February 3, 2012. So in the November 2011 reconvening of the IEP, your view is that there was no amendment to the IEP. There was merely the re-offer of the special education class. Correct. Is that correct? That is correct, Your Honor, because if you look at these IEP documents, including September 23, 2011, October 18, 2011, and November 12, 2011, each IEP has a section where the parent can agree to amend the January 2011 IEP. It's not signed on any of those documents. So the one at issue, to focus on what counsel was asking about, is she's saying post-November 2011 through March, and you're saying there's no amendment to the plan and that she declined to send him back to school. So basically there is no new plan in place, no different plan in place. Correct. Until February 2012. Until February 2012. Then we have an amendment. Correct, Your Honor. And then that sends the child on. Correct, Your Honor, because if you look at the November 2, 2011 IEP, CL's excerpts of record, volume 3, page 133, there is a phrase on that document that states, initial, and there's a space to initial, I agree to the contents of the amendment to the IEP dated 1-18-2011. The signature line there is blank because the mother never consented to an amendment of that January 2011 IEP. Let me make sure I understand what happened here. After the handcuff incident, the mother did not want to send the kid back to the school. Correct. The IEP plan provided for special behavioral classes at school, but the mother did not want to send the kid to school. Correct, Your Honor. The school provided a teacher to come to the home but did not provide a behavior modification specialist to come to the home, and the mother thinks it should have. What I want to know is, did the plan in effect during the time between the handcuffing and the Catholic school say that the school was to provide a behavior specialist where the child was, or did it merely say provide a behavior modification specialist at the school? The only educational program that the parent agreed to after November 2011 was for the district to send a teacher alone into the home. That was all she consented to. The parent had the option. So the school offered behavior modification specialists at school. The mother refused to bring the child to school after what to her would have been this traumatic incident of the child being handcuffed. Correct, Your Honor. Now, as I understood her argument, leaving aside whether she rejected the offer where you were going to provide behavioral services at the school, she reads the January 2011 plan as not location-dependent. But it is location-dependent. Or at least that some of the services are not location-dependent. All the services are designated a location in the IEP document. That is one of the requirements of the Federal Individuals with Disabilities Education Act. The home is not identified as a location. And as the district court judge correctly pointed out in the decision, location is a component of the special education placement. If I may briefly just add with my remaining seconds, this case should be remanded to the district court for dismissal as the appeal was untimely. As the child's counsel has acknowledged, there were only clerical changes made to that decision. And under Federal Rule 60B and the relevant case law, those changes did not commence the running of a new appeal deadline. Thank you. I have a question about that. Do you have any case that marries the IDEA statute with Rule 60? I do not. Okay. And just further, if it's a federal statute and it says 90 days and California says 90 days, what do you do with the fact that I guess the hearing officer called this the Arroyo district because it was in Arroyo but changed it then to the appropriate designation. And at the bottom of each opinion, it says you have 90 days from the opinion or the decision. Well, under the case law decided in our brief, if a situation is ambiguous, the burden rests on the child in this instance to seek clarification. But let me ask you, the opposing counsel says, well, Rule 60 is for a court-to-court appeal, and we do have this Supreme Court case, Henderson v. Shinseki, which said that an appeal from an administrative agency's determination to a court, it's not a jurisdictional limitation. Why isn't this more like Henderson v. Shinseki with not really being a jurisdictional limitation so that Rule 60b wouldn't apply? Well, it may not technically be a jurisdictional limitation given the circuit's relatively recent case law classifying that type of defense as a claim processing rule. Right, exactly. Supreme Court actually did that. However, the appeal was still untimely, and the federal statute is very explicit. There's 90 days to file that appeal, and it's our position that changing the name of the school district in the caption of the decision is just purely clerical and should be dealt with by analogy by looking to Rule 60 for guidance on how to resolve the issue. Thank you. Thank you, Your Honors. Thank you. If you could put a minute back on the clock for rebuttal. Oh, could I ask one more question? We have one more question. Don't go away. I won't. I don't know if this matters or not, but was there any expert opinion that this justifying or any discussion of expense justifying offering the behavioral modification specialist services at the school but not at the home? My inference, which is speculative, is that the school would not want to spend the considerable sum of money to send the specialist to the home and that the parents would not want to send the child to the school after the child had had this, what I imagine to a mentally disturbed child would be a horrible experience of being handcuffed by a policeman, and that that would cause this, everything to fail. It's not a question of cost for the district. The district committed a lot of resources to educating the student. So they don't care what it costs. That means there must have been some expert opinion that said, I guess it's taxpayer's money. It's not theirs. So there's expert opinion that says provide the class at the school, not the home? There's a context I'm going to articulate that will help respond to your question. There's a lot of things that are unusual about this case, and one of them is that when these IEPs were developed, nobody requested and nobody recommended that he receive behavioral services in the home. When the issues were articulated for the administrative… Correct. No one at an IEP team… And they did some behavior modification training. I can't remember. They gave him some sort of reward, and then they gave him points or took away points, kind of a merit, demerit system. That was the behavior modification system. Correct. They would use reinforcements to encourage him. Right. And so I'm wondering, it's perfectly understandable in the circumstances that after the kid gets handcuffed by the cops, mom does not want to send him back to school for more of that. And I'm wondering, what was the basis? I assumed it was money, and you say it's not. What was the basis for not sending a behavior modification specialist to the home? The district has a legal obligation to educate this child in the least restrictive environment, which is exposure to typical peers. The IEP team correctly determined… Also, it was the mainstreaming idea, at least get him in the school building, even if he's not in a regular class then. Correct. That is one of the key components of the federal law, and it would not have been appropriate for the district to simply move his entire program into the home. Thank you. Thank you, Your Honors. Thank you, Your Honors. I would just like to follow up quickly on that with regards to restrictive. My client, I'm sure, would argue that being handcuffed and secluded and restrained repeatedly is much more restrictive than being at home and receiving home instruction. Is that what it means? I thought it meant mainstreaming. No, it's actually a continuum of placement. So mainstreaming means to the extent practical being educated with children who are not disabled. But also, I did want to just point out that the mother did turn down 20 days of summer school the summer preceding the handcuffing incident. And there was testimony at hearing the teacher agreed that he needed a break. And so he successfully did karate and tutoring over the summer without any behavioral problems. So in your view, she didn't refuse the services. She provided what would be appropriate for the child. Exactly. And he did need a break. Also, furthermore, in the fall, he was placed in a new class with a new aide who had never met him, who had no training with him, who had never taught a child with autism before, had never been an aide before. And it is kind of a leap of logic to assume that his failure in that setting was the result of him not attending 20 days of summer school. All right. Thank you. I think we have your arguments well in hand from both counsel, and we appreciate your arguments this morning. CL versus Lucia Mar, Unified School District is submitted, and we're adjourned for the morning.
judges: Kleinfeld, McKeown, Ikuta